# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRANDON HOSCH | Case No. 18-CR-352-2<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

On July 3, 2018, the Grand Jury returned an indictment against Defendant Brandon Hosch ("Defendant"), along with his co-defendant Kenneth Pittman ("Pittman"), charging them with unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and (2). Indictment [27].

On October 17, 2018, Defendant moved to quash his arrest and suppress subsequently derived evidence, including incriminating statements Defendant made to law enforcement officers. Def.'s Mot. Quash & Supp. [42]. Defendant claimed that his arrest by law enforcement, including agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), was unlawful under the Fourth Amendment, and consequently, this Court should exclude the "direct or derivative use" of such evidence. [42] at 7; *Wong Sun v. United States*, 371 U.S. 471 (1963) (suppression of unlawfully obtained evidence and any "fruit of the poisonous tree").

On December 6, 2018, this Court set a hearing on the Defendant's motion, during which the parties agreed that an evidentiary hearing was not necessary. When pressed

1

by this Court about the need for an evidentiary hearing, defense counsel stated in open court that he reviewed the government's version of the facts, as set forth in their response [52], and he confirmed the accuracy of those facts for the purposes of this motion.[1] Accordingly, this Court makes the following factual findings (pulled directly from the parties' agreement) and draws the resulting conclusions of law.

## I. Findings of Fact

Beginning in May 2018, Pittman and a cooperating individual (CI) began communicating by video and text message regarding Pittman's desire to purchase firearms from the CI. During those exchanges, which were conducted and recorded at the direction of law enforcement, Pittman indicated to the CI that he wished to obtain firearms because he planned to sell them to others. For example, during a May 30, 2018 FaceTime video call, Pittman asked the CI when he would be back in Chicago, and when the CI said that it would be the following week, Pittman responded that he was making me "look like a liar, man," and that he was "getting this easy money," and that he already had the "paperwork" in his hands. Later, in a June 4, 2018 text message conversation, the CI sent Pittman a text message containing a photograph depicting several firearms. Pittman responded "When" and the CI replied "Tomorrow."

The following day, during a recorded FaceTime video call, Pittman and the CI

---

[1] At this hearing, the parties also stipulated that the specific officer involved in the Defendant's arrest was not involved in communications earlier that morning between ATF agents working the investigation regarding the circulation of the photograph of Defendant. Based upon the collective knowledge doctrine discussed below, however, this additional fact does not materially alter this Court's analysis.

discussed a purchase price for Glock pistols, and Pittman tried to negotiate a discount for purchasing more than one firearm. Pittman told the CI that he was "about to line them up right now," which the CI and law enforcement understood to mean that Pittman was gathering the funds to purchase the firearms. The CI responded, "Get it together right now." Later that evening, Pittman told the CI during a FaceTime call that he "already got a couple" individuals' "money right now."

On June 6, beginning at approximately 11:44 a.m., at law enforcement's direction, the CI placed a series of recorded telephone calls to Pittman. During the calls, Pittman requested two Glocks from the CI, and the CI and Pittman tried to reach an agreement about the time and location for the sale. Over the next hour, the CI and Pittman exchanged calls regarding the time and place for the gun purchase. At approximately 12:54 p.m., during a recorded telephone call, the CI and Pittman agreed to meet at a bowling alley parking lot near Torrance Avenue and 101st Street in Chicago, Illinois.

On June 5, 2018, as part of its investigation into the attempt to purchase firearms, law enforcement sought and obtained a warrant and order relating to Pittman's telephone, authorizing the installation and use of a pen register and trap and trace device, requiring the service provider to furnish: (1) subscriber information for Pittman's phone and the telephone numbers in contact with it; (2) historical call detail records for Pittman's phone; and (3) the location information for Pittman's phone. Pursuant to that warrant, in the hours prior to the arrest on June 6, 2018, ATF agents

3

monitored information pertaining to Pittman's phone, including location information and toll information regarding phone calls placed by Pittman.

From monitoring the pen register and checking law enforcement databases, the ATF agents determined that Pittman contacted at least three individuals who law enforcement identified as potentially convicted felons, including the Defendant. In these records, ATF identified a telephone call made from Pittman's phone to a telephone number, ending in 1064 and registered to an individual named "Cynthia Hosh [sic]" ("Hosch's phone") that was made at 12:09 p.m. and lasted 40 seconds. A second call was placed from Hosch's phone to Pittman's phone approximately one minute later, and the call lasted one minute and 21 seconds. At 12:33 p.m., Hosch's phone called Pittman's phone a second time, and the call lasted 17 seconds. That morning, prior to the drug transaction, ATF further identified the Defendant as a potential user of Hosch's phone and was also able to determine that the Defendant was a convicted felon. ATF agents were then able to view a known photograph of Hosch prior to his arrival with Pittman at the gun purchase.

After changing the time and location of the meeting multiple times, Pittman and the CI agreed to meet at the bowling alley parking lot near Torrance Avenue and 101st Street in Chicago, Illinois. Pittman sent a text message to the CI informing the CI that he would be arriving at the transaction in a "white truck." At approximately 1:00 p.m., the CI and an undercover agent ("UC") arrived at the bowling alley and parked in the southeast corner of the parking lot. Shortly thereafter, Defendant, driving his white

4

Saturn SUV, arrived at the bowling alley parking lot with Pittman in the passenger seat. They parked in the northwest corner. Neither car was parked near the entrance to the bowling alley. Pittman then got out of the white SUV and approached the CI's vehicle on foot. As Pittman was crossing the parking lot, the UC instructed the CI to retrieve a tool box containing six firearms from the back seat of the undercover vehicle. The CI put the tool box on the center console and got out of the vehicle to greet Pittman.

The CI then got into the center rear seat of the vehicle, the UC remained in the driver's seat, and Pittman got into the front passenger seat. The CI began to take pistols out of the tool box, and Pittman asked the UC to drive the undercover vehicle across the parking lot closer to the white SUV, but the UC told him he could take the toolbox to transport the firearms to his vehicle. Pittman took cash out of his pants pocket and handed it to the CI. The UC asked "how much money?" and Pittman responded "All I got with me." The UC then got out of the vehicle under the pretense of getting ammunition from the rear of the undercover vehicle. Pittman grabbed the handle of the toolbox, and said, "What's this?" and opened the toolbox and looked inside. Pittman said "I just want two guns. I just told you two Glocks, bro, tha's all I told you, two Glocks." He then reached his hand into the toolbox and touched the firearms.

During the transaction, Defendant remained in the parked white Saturn SUV, away from the entrance to the bowling alley.

After Pittman took the firearms, ATF agents intervened and simultaneously placed both Pittman and the Defendant under arrest and took them into custody.

Following his arrest, Defendant waived his *Miranda* rights and gave a recorded statement to law enforcement. In that statement, he told law enforcement that he was present at the transaction because he intended to purchase firearms, that he had previously communicated with Pittman about Pittman's ability to acquire firearms for Defendant, that Defendant had picked up Pittman to drive him to the gun sale, and that he had given Pittman $400 in cash for Pittman to purchase a firearm for Defendant.

## II. Conclusions of Law

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Under this amendment, "warrantless arrest, like a warrantless search, must be supported by probable cause." *United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996). Probable cause to justify an arrest exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013).

Under this standard, the relevant circumstances encompass the entire factual picture, including rational inferences drawn from the facts based upon the experience of the officers; and thus, the existence of probable cause "does not deal with hard certainties," but rather it deals "with probabilities." *Illinois v. Gates*, 462 U.S.

6

213, 231 (1983) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)). Though probable cause requires "something more than a hunch," it does not require a finding "that it was more likely than not" that the individual has engaged in unlawful activity. *Abbott*, 705 F.3d at 714; *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) ("Probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity.") (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). Indeed, probable cause requires far less of a showing. *See, e.g., United States v. Gary*, 790 F.3d 704, 707-708 (7th Cir. 2015) (Even though there "could have been innocent explanations" for the defendants' actions, "the inference of the criminal activity was reasonable for purposes of probable cause.") (citing *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) (finding probable cause where "the inference of illegal conduct by trained and experienced officers is at least as probable as any innocent inference")).

Additionally, this Court's inquiry remains an objective one; the subjective motivations of the officer cannot invalidate a seizure otherwise supported by probable cause. *See Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010). In other words, although this Court focuses upon what the officers knew "at the time of the arrest," it must determine "whether those facts and circumstances, 'viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Id.* (quoting *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)).

Finally, under the "collective knowledge" doctrine, the police "who actually make the arrest need not personally know all the facts that constitute probable cause if they

7

reasonably are acting at the direction of another officer or police agency." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (quotations and citations omitted). In such cases, an arrest is proper so long as the "collective knowledge of the agency" is "sufficient to constitute probable cause." *Id.*; *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (An officer's stop is reasonable if it is justified based upon "the collective knowledge" of officers investigating as part of a joint endeavor, even if the individual arresting officer's firsthand knowledge remains insufficient on its own.). *See also United States v. Ledford,* 218 F.3d 684, 689 (7th Cir. 2000) (if the search or seizure constitutes a "joint endeavor," the court may properly consider what other officers knew and impute that collective knowledge to the officers taking action).

Applying the requisite standard here, law enforcement possessed probable cause at the time of Defendant's arrest. Based upon the record, the officers' knowledge included the following facts:

- Pittman discussed with the CI that he had been arranging to illegally purchase firearms for others;
- Pittman discussed with the CI that he had been collecting money from others to purchase those firearms;
- Pittman, between setting up the gun buy and arriving at the transaction, had been in telephone contact with potential convicted-felon buyers;
- Pittman, between setting up the gun buy and arriving at the transaction, had likewise been in contact (both placing and receiving calls) with a telephone tied to Defendant;
- Defendant was himself a convicted felon;
- ATF obtained and identified a photograph of Defendant prior to the transaction;
- Defendant had driven Pittman in a white truck (with no others in the

8

- vehicle) to the gun buy, which (by pre-arrangement) was located in a bowling alley parking lot during the middle of the day;
- Defendant parked the white truck (matching Pittman's prior description from the recorded conversations) in the northwest corner of the lot away from the bowling alley entrance, and then waited in the vehicle while Pittman crossed the parking lot and got into another vehicle to meet and converse with the CI and UC.

Given the intrinsically dangerous and clandestine nature of the black-market gun deal at issue here, the record undermines the notion that Defendant was merely an unknowing spectator or that Pittman simply chose to invite an unsuspecting Defendant along for the ride. To the contrary, at least for the purposes of probable cause, the facts support a reasonable inference by trained police officers that the Defendant came to the scene to unlawfully buy the firearms. The co-conspiratorial statements established that Pittman served as an unlawful broker for buyers who, as convicted felons, could not lawfully purchase firearms on their own. Specific, contemporaneous phone records, and law enforcement databases, further corroborated the inference that Defendant was himself one of these felon-buyers. The subsequent facts later confirmed this conclusion when Defendant and Pittman (and no others) rode together to the pre-arranged site of the gun transaction in a bowling alley parking lot, and then parked far from the entrance, further demonstrating a preconceived intent to meet the CI and UC. In short, based upon the totality of the circumstances known at the time, an objectively reasonable police officer could easily infer that Defendant played an active part in the pre-arranged criminal activity, and that he was certainly not there to go bowling.

## III. Conclusion

Based upon the above, the Court denies Defendant's Motion to Quash Arrest and Suppress Evidence [42].

Date: January 24, 2019

ENTERED:

_____
John Robert Blakey
United States District Judge